# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**GOLDI Y. CAPALUNGAN,**

      Petitioner,

  v.                                       Civil Action 2:18-cv-1276
                                               Judge George C. Smith
                                               Magistrate Judge Kimberly A. Jolson

**EMMANUEL R. LEE,**

      Respondent.

## OPINION AND ORDER

This matter is before the Court on Respondent's Motion for Summary Judgment (Doc. 22). For the reasons that follow, the Motion is **DENIED**.

## I.    BACKGROUND

Petitioner and Respondent are the biological parents of EZL, a minor child, and the subject of the instant Petition for the Return of Child to Australia Pursuant to the Convention on the Civil Aspects of International Child Abduction (Doc. 1). EZL was born on August 31, 2012 in the Philippines where he resided with Petitioner until January 22, 2016, when they moved to Australia. (Doc. 24-2, ¶ 2). From January 22, 2016 to February 22, 2017, EZL lived with Petitioner in Australia. (*Id.*, ¶ 7). Since prior to EZL's birth, Respondent has resided in the United States. (*Id.*, ¶ 5).

During his time in Australia, EZL attended 3 Apple's Childcare and Kindergarten five days per week from 7:30 a.m. until 5:00 p.m. (*Id.*, ¶ 7). EZL also attended church and Sunday school, visited museums and amusements parks, went to the movies, and enrolled in swimming classes. (*Id.*). Petitioner and EZL lived with Petitioner's younger sister and niece in Melbourne, Australia. (*Id.*, ¶ 8). EZL developed a close relationship with his aunt and cousin with whom he participated

in a variety of extracurricular activities. (*Id.*). Petitioner and EZL also visited with other family members during their time in Melbourne. (*Id.*).

In early 2017, the parties began discussing Petitioner's career plans. Petitioner was working to complete her training for a job as a nurse care manager. (*Id.*, ¶ 9). The parties discussed Petitioner and EZL traveling to the United States so that Respondent could care for EZL and apply for his permanent residency while Petitioner returned to Australia to complete her training. (*Id.*).

Petitioner and EZL traveled to the United States on or around February 22, 2017. (*Id.*). Shortly thereafter, the Petitioner returned to Australia to complete her training program. (*Id.*, ¶ 10). The parties' relationship then deteriorated. (*See id.*, ¶ 18). In December 2017, Petitioner traveled to the United States to take custody of EZL and return to Australia. (Doc. 1, ¶ 37). She requested that Respondent provide her with EZL's passport so that she could return to Australia with him. (Doc. 24-2, ¶ 21). Respondent refused, and Petitioner returned to Australia without EZL. (*Id.*). The parties' relationship deteriorated even further (*id.*, ¶¶ 22–24), leading to the filing of this action.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing

*v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (defining "genuine" as more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III. DISCUSSION

Respondent moves for summary judgment on three different grounds: (1) there was no wrongful retention because the minor child's habitual residence was and is the United States; (2) the Petition was filed more than one year after the alleged wrongful retention, and EZL is now settled in his new environment; and (3) Petitioner consented to EZL living in the United States with Respondent. The Court addresses each of these arguments in turn.

The purpose of the Hague Convention is "to return children 'to the State of their habitual residence,' to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child." *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2018) (en banc) (quoting Hague Convention pmbl.).

> Federal law, namely the International Child Abduction Remedies Act, implements the Hague Convention and hews to the treaty's language. A parent may petition a federal or state court to return abducted children to their country of habitual residence. The federal or state court determines whether to return the child. Courts in the country of habitual residence then determine the merits of any underlying child custody claims.

*Taglieri*, 907 F.3d at 407 (internal citations and quotation marks omitted).

The parent seeking return of a child must prove by a preponderance of evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). A child's removal or retention is "wrongful" when:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. "Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

Two of those exceptions are relevant here. The Convention does not require the return of the child if: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment," Hague Convention, art. 12; or, (2) "the person seeking return of the child consented to or subsequently acquiesced in the removal or retention," Hague Convention, art. 13a. *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Both require the respondent to prove them by a preponderance of the evidence. *Id*.

**A. Habitual Residence**

"Habitual residence marks the place where a person customarily lives." *Taglieri*, 907 F.3d at 407 (citation omitted). This is a question of fact. *Id.* at 408 (collecting cases). When determining a child's habitual residence, the Sixth Circuit applies one of two standards depending on the facts of the case. *Id.* at 407. "The primary approach looks to the place in which the child has become 'acclimatized.'" *Id.* (quoting *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017)). "The second approach, a back-up inquiry for children too young or too disabled to become

4

acclimatized, looks to 'shared parental intent.'" *Taglieri*, 907 F.3d at 407 (quoting *Ahmed*, 867 F.3d at 689).

> When applying the acclimatization standard:
>
> the question is whether the child has been physically present in the country for an amount of time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective. District courts ask these sorts of questions in determining a child's acclimatization: whether the child participated in academic activities, social engagements, sports programs and excursions, and whether the child formed meaningful connections with the country's people and places.

*Taglieri*, 907 F.3d at 408 (internal citations, alterations, and quotation marks omitted). This analysis is guided by five principles:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007) (internal citations, alterations, and quotation marks omitted).

To determine EZL's habitual residence, the Court must first determine when the alleged wrongful retention began. *See McKie v. Jude*, No. CIV.A. 10-103-DLB, 2011 WL 53058, at *6 (E.D. Ky. Jan. 7, 2011) ("The date of the alleged wrongful retention is used to fix the time period available for assessing what country is properly the child's habitual residence." (citation omitted)). When determining the date the alleged wrongful retention began, "courts look to the last date upon which it is undisputed that the child was in the new country with both parents' consent." *Djeric v. Djeric*, No. 2:18-CV-1780, 2019 WL 1046893, at *3 (S.D. Ohio Mar. 5, 2019) (citation omitted).

5

"Specifically, courts look to the date when the non-abducting parent was truly on notice that the abducting parent was not going to return the child." *Id.* (citation omitted); *see also* Federal Judicial Center, *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges* at 27–28 (2d Ed. 2015) (hereinafter "Hague Convention Guide for Judges") ("In the case of a wrongful retention, the time begins to run either (1) from the date when the child remains with the abducting parent despite the clearly communicated desire of the left-behind parent to have the child returned, or (2) when the acts of the abducting parent are so unequivocal that the left-behind parent knows, or should know, that the child will not be returned.").

The parties dispute when the alleged wrongful retention occurred. (*Compare* Doc. 24 at 10 (arguing that the alleged wrongful retention began in December 2017) *with* Doc. 25 at 5 (arguing that any wrongful retention began in July 2017)). Petitioner has offered evidence that she requested to take EZL back to Australia on January 5, 2018, but that Respondent refused to provide her with EZL's passport. (Doc. 24-2, ¶ 21).[1] If true, a fact-finder could reasonably conclude that the wrongful retention began on that date. *See Djeric*, 2019 WL 1046893, at *3.

Respondent insists that the date of the alleged wrongful detention could have occurred only in July 2017. (Doc. 25 at 5). He offers no explanation of why that is the date at which the wrongful retention began. (*See id.*). Presumably, though, it is because that is around the time period that Petitioner would have completed her training program in Australia and initially requested the return of EZL. Even if Respondent provided evidence to support this position, all it would mean is that there is a genuine issue of material fact as to when the wrongful retention began.

---

[1] In her briefing and affidavit, Petitioner repeatedly asserts that Respondent's wrongful retention of EZL began in December 2017. (*See, e.g.*, Doc. 24 at 10 (arguing that the alleged wrongful retention began in December 2017); Doc. 24-2, ¶ 25 ("Since December 2017, the Respondent has wrongfully retained EZL in the United States without my consent or acquiescence.")). The Court has been unable to identify any evidence in the record to support this contention. But Petitioner is free to present such evidence at trial.

The Court must therefore determine EZL's habitual residence in the time period prior to the alleged wrongful retention. Petitioner has presented evidence that EZL resided in Australia for more than a year prior to arriving in the United States, from January 2016 to February 2017. (Doc. 24-2, ¶ 7). During that time, EZL attended daycare and kindergarten five days per week, attended church, visited museums and amusements parks, went to the movies, enrolled in swimming classes, and visited extended family. (*Id.*, ¶¶ 7–8). Further, Petitioner and EZL lived with Petitioner's younger sister and niece in Melbourne, Australia, and EZL developed a close relationship with his aunt and cousin with whom he participated in a variety of extracurricular activities. (*Id.*, ¶ 8). From a child's perspective, these are hallmarks of a habitual residence. *See Taglieri*, 907 F.3d at 408 ("District courts ask these sorts of questions in determining a child's acclimatization: whether the child participated in academic activities, social engagements, sports programs and excursions, and whether the child formed meaningful connections with the country's people and places." (citation, alteration, and internal quotation marks omitted)).

The question is whether EZL's habitual residence changed when he resided in the United States from February 2017 to the date of the alleged wrongful retention in January 2018.[2] *See Robert*, 507 F.3d at 989 ("Only a change in geography and the passage of time may combine to establish a new habitual residence." (citation and internal quotation marks omitted)). As discussed above, Petitioner has offered evidence that EZL developed strong ties to Australia in 2016 and 2017 prior to his arrival in the United States. (Doc. 24-2, ¶¶ 7–8). In Petitioner's view, Australia was EZL's habitual residence, and his temporary visit to the United States did nothing to alter this fact. (Doc. 24 at 9–16). In response, Respondent has offered evidence that, after EZL arrived in

---

[2] Although there is a genuine issue of material fact as to the date the wrongful retention began, the Court uses the date supported by Petitioner's evidence for purposes of summary judgment. *See Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing *Adickes*, 398 U.S. at 158–59)).

the United States in February 2017, he attended school and participated in extracurricular activities prior to the alleged wrongful retention. (*See, e.g.*, Docs. 25-2, 25-3). According to Respondent this demonstrates that EZL was acclimatized to the United States at the time of the alleged wrongful retention, and the United States was, therefore, EZL's habitual residence. (Doc. 25 at 5). Based on the available evidence, there is a genuine issue of material fact as to whether EZL's habitual residence was Australia or the United States prior to the alleged wrongful retention in January 2018. *See Djeric*, 2019 WL 1046893, at *4 (concluding that minor child's habitual residence was "a close question" because he had "engaged in productive activities during his time in both Serbia and the United States"). The Court, therefore, denies summary judgment as to this issue.

### B. Well-Settled Defense

Respondent argues that Petitioner did not commence these proceedings until more than a year after the alleged wrongful retention and that EZL is now well-settled in the United States. (*See* Doc. 25 at 7).

"Article 12 establishes a one-year limitations period circumscribing the power of a petitioned court. If the petitioner initiated proceedings within a year of the child being wrongfully removed or retained, the court must order the child's return in the absence of some other exception or defense." *Blanc v. Morgan*, 721 F. Supp. 2d 749, 762 (W.D. Tenn. 2010). "If a year or more elapsed between the wrongful removal or retention and petitioner's initiation of proceedings, the court need not order the child's return if the respondent establishes by a preponderance of the evidence that the child is 'now settled in its new environment.'" *Id.* (quoting Hague Convention, art. 12).

Because there is a genuine issue of material fact as to the date of the alleged wrongful retention, *see supra* Sec. II.A, there is a genuine issue of material fact as to whether the well-settled defense is potentially applicable. Petitioner commenced these proceedings on October 23, 2018. (*See* Doc. 1). If, as Petitioner argues, the wrongful retention occurred on January 5, 2018, the Petition was filed well within Article 12's one-year time frame, and the well-settled defense would not apply. *See* Hague Convention, art. 12. If, as Respondent argues, the wrongful retention occurred in July 2017, the Petition was not filed within Article 12's one-year time frame, and the well-settled defense could potentially apply. *See id.* The Court therefore denies summary judgment as to this issue.

### C. Consent or Acquiescence

Respondent also contends that Petitioner consented or acquiesced to EZL remaining in the United States. (Doc. 22 at 7–8; Doc. 25 at 9–10). He emphasizes that Petitioner voluntarily brought EZL to the United States and executed legal documents allowing the child to stay in the United States. (Doc. 25 at 9–10).

"Article 13(a) of the Hague Convention provides a statutory defense against the child being returned to the country of habitual residence if defendant proves by a preponderance of the evidence that plaintiff consented to or subsequently acquiesced in the child's removal or retention." *Guevara v. Soto*, 180 F. Supp. 3d 517, 528 (E.D. Tenn. 2016). "'Consent' and 'acquiescence' are not defined in the Hague Convention," *id.* (citing *Friedrich*, 78 F.3d at 1069 n.11), and courts treat them as distinct concepts, *see* Hague Convention Guide for Judges at 101. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (citing *Gonzalez-*

9

*Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)). "[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. "Unlike acquiescence, a petitioner's informal statements or conduct can manifest consent." *Diagne v. Demartino*, No. 2:18-CV-11793, 2018 WL 4385659, at *8 (E.D. Mich. Sept. 14, 2018) (citing *Baxter*, 423 F.3d at 371).

From the briefs, it is unclear whether Respondent is arguing that Petitioner consented or acquiesced to the retention of EZL. Regardless, Respondent is not entitled to summary judgment on either defense. As an initial matter, the Court notes that consent and acquiescence are affirmative defenses on which Respondent bears the burden of proof. But other than the text of the Hague Convention, Respondent cites no authority or evidence in support of his consent or acquiescence defenses. (*See* Doc. 22 at 7–8; Doc. 25 at 9–10). The Court is not obligated to develop Respondent's argument for him, or to search the record for evidence to support his defenses, *see Sagan v. Sumner Cty. Bd. of Educ.*, 501 F. App'x 537, 540 (6th Cir. 2012) (per curiam) ("The district court has no independent obligation to search the record for evidence that would enable a party's claims to survive summary judgment, and neither do we." (citation omitted)).

The Court has, nonetheless, reviewed the record and concludes that there is a genuine issue of material fact as to Respondent's consent and acquiescence defenses. Respondent emphasizes that Petitioner voluntarily brought EZL to live with him in the United States. Petitioner responds that she provided her limited consent for EZL to reside with Respondent while she completed her job training in Australia and EZL applied for permanent residency. (Doc. 24-2, ¶ 9). That, of course, does not mean that Petitioner consented to the indefinite retention of EZL:

> Often, the petitioner grants some measure of consent . . . in an informal manner before the parties become involved in a custody dispute. . . . In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.

*Baxter*, 423 F.3d at 371.

Respondent also relies on Petitioner's voluntary execution of a notarized contract[3] and the parties' Shared Parenting Plan to argue that she consented to him indefinitely retaining EZL in the United States. (Doc. 22 at 8; Doc. 25 at 9-10). On its face, the Shared Parenting Plan provides little, if any, support for the contention that Petitioner consented to Respondent indefinitely retaining EZL in the United States. (*See generally* Doc. 25-9). The same is true of the other exhibits presented by Respondent. (*See generally* Docs. 25-2–25-8, 25-10). In contrast, Petitioner has presented evidence demonstrating her efforts to ensure that EZL was returned to Australia consistent with the parties' initial agreement and prior to the alleged wrongful retention. (*See, e.g.*, Doc. 24-2, ¶ 9 ("From EZL's arrival in the United States on February 22, 2017 until the wrongful retention occurred on or about December 2017, the Respondent and I had engaged in multiple text message conversations regarding the completion of my job training, the status of EZL's permanent residency application and my repeated requests to have EZL returned to Australia); Doc. 5-1 at 27 (June 1, 2017 text messages discussing status of EZL's permanent residency application); Doc. 5-2 at 20 (July 27, 2017 text messages regarding the same)). There is, therefore, a genuine issue of material fact as to whether Petitioner consented to EZL's retention in the United States, and the Court denies summary judgment as to this issue accordingly.

---

[3] It is unclear to the Court if this document is part of the record. Respondent has referenced it in his briefing but has not cited to the record. The Court has been unable to identify the referenced document on its own.

Similarly, there is a genuine issue of material fact as to whether Petitioner acquiesced to Respondent's alleged wrongful retention of EZL. Plaintiff has presented evidence that, after the alleged wrongful retention on January 5, 2018, she repeatedly challenged Respondent's retention of EZL and demanded that EZL be returned to Australia. (*See, e.g.*, Doc. 2-2 at 33–34; Doc 2-3 at 2–4, 6, 8–11, 13–22, 24–38, 49–60; Doc. 2-4; Doc. 2-5). These are not the actions of a parent acquiescing to the wrongful retention of their child. *See Friedrich*, 78 F.3d at 1070 ("[A]cquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."). Respondent, conversely, has not presented any evidence of Petitioner's conduct post-retention that would support a finding that she acquiesced to EZL's retention. The Court denies summary judgment as to this issue accordingly.

## IV. CONCLUSION

For the foregoing reasons, Respondent's Motion is **DENIED**.

IT IS SO ORDERED.

Date: March 25, 2019

/s/ George C. Smith
GEORGE C. SMITH
UNITED STATES DISTRICT JUDGE


/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE