**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**GOLDI Y. CAPALUNGAN,**

              **Petitioner,**

    **v.**                            **Civil Action 2:18-cv-1276
Judge George C. Smith
Magistrate Judge Kimberly A. Jolson**

**EMMANUEL R. LEE,**

              **Respondent.**

## REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner's Petition for the Return of Child to Australia Pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Petition") (Doc. 1). For the reasons that follow, it is **RECOMMENDED** that the Petition be **DENIED**.

## I.    INTRODUCTION

This should be an easy case. The parties are the biological parents of a six-year-old child, EZL. Petitioner is EZL's mother and a resident of Australia. Respondent is EZL's father and a resident of the United States. For the first four and a half years of EZL's life, Petitioner was his primary caregiver. In February 2017, Petitioner brought EZL to the United States for a visit with Respondent. Although the parties disagree as to when that visit was supposed to end, they agree on one simple fact: EZL was to be returned to Australia to the custody of Petitioner. Respondent has conceded that he violated the parties' agreement that EZL be returned to Australia. A reasonable person might expect that an international treaty concerning child abduction would offer Petitioner relief in this situation and permit the Court to enforce the parties' agreement and return EZL to Australia. That person would be mistaken, as Sixth Circuit precedent makes clear.

The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") seeks "to return children to the State of their habitual residence" and "to require any custody disputes to be resolved in that country." *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2018) (en banc) (citation and internal quotations omitted). If a petitioner seeks to return his or her child to a country that is not the child's habitual residence, the Convention does not apply.

In cases of wrongful retention, courts must determine the child's habitual residence at the time the wrongful retention began. At the time of his alleged wrongful retention, EZL was five years old. For children this age, the Sixth Circuit generally applies an acclimatization standard to determine habitual residence, asking "whether the child has been physically present in the country for an amount of time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective." *Id.* at 408 (citation and internal quotations omitted). EZL had lived in the United States for approximately ten months before the alleged wrongful retention. During that time, he developed close relationships with family members here, attended school, made friends, and participated in a variety of extracurricular activities. At the time of the alleged wrongful retention, the United States was therefore EZL's habitual residence. As a result, the Hague Convention cannot provide relief for Petitioner here.

## II. FACTUAL BACKGROUND

The following factual account is based on the evidence presented by the parties at trial, including numerous witnesses and exhibits.[1] For many of the witnesses, English was not their first

---

[1] The parties did not order copies of the transcript for the April 10, 2019 trial, so official transcripts from the trial have not been filed. In preparing this Report and Recommendation, the Undersigned has relied upon a courtesy rough draft of the trial transcript provided by the court reporter, her notes from the trial, and her own recollection.

language. Although their thoughts were not always expressed with the fluency of a native English speaker, the Undersigned had little, if any, trouble understanding their testimony.

At trial, the Undersigned observed first-hand the parties and their respective witnesses as they testified. In evaluating their credibility, the Undersigned considered the consistency of their testimony throughout the proceedings, the consistency of their testimony with the parties' documentary evidence, and their demeanor. With one exception, the Undersigned generally found the parties to be credible. Respondent was consistently evasive and less than candid when testifying about the parties' agreement to return EZL to Australia. He did, however, concede that the parties had agreed EZL would be returned to Australia and that he failed to comply with that agreement. The Undersigned also found the third-party witnesses to be generally credible.

**A. EZL's Birth and Life in the Philippines**

Petitioner and Respondent are the biological parents of EZL, the subject of the instant Petition. (Doc. 1; Doc. 36-3, Resp.'s Ex. A). Approximately ten years ago, the parties began their relationship in the Philippines where Petitioner was a nurse and Respondent was a doctor. Respondent moved to the United States in April 2011.

EZL was born on August 31, 2012 in the Philippines. (Doc. 36-3, Resp.'s Ex. A). At that time, Respondent was living in the United States. Although it is unclear how many times Respondent visited Petitioner and EZL in the Philippines, Petitioner testified that Respondent visited at least two times. Respondent testified that he visited Petitioner and EZL every six months and would stay for six months at a time. When Respondent was in the Philippines, the parties would stay together with EZL at Respondent's father's house in Quezon City. When Respondent was in the United States, Petitioner and EZL would live with Petitioner's mother in Makati City.

While Petitioner and EZL resided in the Philippines, the parties did not have any custody agreement or order. Although Respondent did not pay child support to Petitioner, Respondent's father provided the parties with financial support when Respondent was in the Philippines. Additionally, the parties set up a joint bank account in which they save money given to them as gifts for EZL.

**B. EZL's Life in Australia**

In January 2016, Petitioner and EZL moved to Australia. Petitioner and EZL lived in Melbourne, Australia until approximately February 18, 2017. Initially, Petitioner and EZL lived with Petitioner's sister, Kristal; Kristal's daughter, Gabrianna; and Kristal's friends. After about a month, Petitioner and EZL moved into a house with Kristal and Gabrianna. EZL and Gabrianna grew up together in the Philippines and were "like brothers and sisters." On the weekends, EZL and Petitioner would go to parks, museums, and other local events. On Sundays, they regularly attended church. Kristal and Gabrianna often participated in these activities with them.

From June 2016 to February 2017, EZL attended 3 Apples Kindergarten full-time, Monday through Friday. (Doc. 36-1, Pet.'s Ex. 1). At school, he learned basic skills, such as writing. Petitioner was responsible for EZL's daily care, including teaching him to read and write and taking him to medical and dental appointments.

When EZL was in Australia, Respondent resided primarily in the United States where he was completing a medical observership to secure residency in the United States and obtain a state medical license. Respondent had no contact with EZL when he lived in Australia. The parties did not have any custody agreement while Petitioner and EZL resided in Australia.

### C. Petitioner's New Job and the Parties' Agreement

In January 2017, Petitioner obtained new employment in Australia. In December 2016 and January 2017, the parties began communicating about that new job and the training Petitioner would have to complete for that job. Specifically, they discussed the possibility of EZL visiting Respondent in the United States during Petitioner's training period. The parties expected the training to last about six months—the same length of time as EZL's tourist visa.

At trial, the parties offered competing accounts of the terms of their agreement for the return of EZL to Australia. Petitioner testified that the parties' original plan was for EZL to stay in the United States while she completed her training in Australia. At some point in time, Petitioner testified, the parties agreed that EZL would be returned after Petitioner's training was complete and after EZL was granted permanent residency in the United States. Petitioner believed that EZL's permanent residency process would be completed before she was done with her six-month job training. She testified that she never agreed that EZL could stay in the United States indefinitely.

Although Respondent conceded that "initially" EZL "was to be returned to Australia" in August 2017, at another point, he insisted that the agreement had always been that EZL would reside in the United States until he received citizenship here. He repeatedly emphasized that Petitioner agreed to EZL residing in the United States until EZL received citizenship here. Regardless of the details of the parties' agreement, Respondent admitted that he agreed to return EZL to Australia. Yet he did not do so.

The objective evidence generally supports Petitioner's account of the parties' agreement. In a February 5, 2017 text conversation, Respondent agreed that he would return EZL to Australia in August 2017. (Doc. 36-1, Pet.'s Ex. 2 at 17). In a February 4, 2018 conversation, Respondent

acknowledged that they had agreed EZL's grandfather would return EZL to Australia after EZL received permanent residency in the United States. (Doc. 36-2, Pet.'s Ex. 18 at 5; *see also id.*, Pet.'s Ex. 31 at 1 (March 20, 2019 text in which Respondent acknowledged the same agreement)). As best the Undersigned can tell, the parties agreed that EZL would be returned to Australia after he received permanent residency in the United States, and Respondent unilaterally imposed the condition that EZL would not be returned until after he became a citizen.

### D. EZL's Life in the United States

Petitioner and EZL traveled to the United States in late February 2017. Upon arrival in Columbus, Petitioner and EZL stayed with Respondent, Respondent's sister, and Respondent's nephew, Matthew. Petitioner left for Australia after a week or two to begin her job training.

After Petitioner's departure in March 2017, EZL began to adjust to life in the United States. He developed a close relationship with his cousin, Matthew. (*See generally* Doc. 36-3, Resp.'s Ex. D at 18–45). He and Mathew shared a room together. Respondent cared for EZL and Matthew, cooking for them and riding bikes with them in the afternoon. He also took them to the movies, theme parks, the zoo, and museums. EZL regularly attended church and visited with family friends. In addition, EZL attended a bible school for children hosted by Grace Polaris Church. (Doc. 36-3, Resp.'s Ex. F). EZL also played on a basketball team.

The Court heard testimony from EZL's first grade teacher, principal, fellow church members, and two aunts. Their testimony generally corroborated Respondent's account of EZL's activities in the United States.

As EZL was adjusting to life in the United States, Petitioner repeatedly asked Respondent about the upcoming expiration of EZL's passport and EZL's immigration status in the United States. (Doc. 36-1, Pet.'s Exs. 9–11). EZL needed a valid passport to return to Australia. When

questioned about EZL's immigration status in August 2017, Respondent stated that there was "a long backlog" of applicants, so they would "have to wait." Petitioner asked Respondent if EZL was able to leave the United States, and Respondent informed her that EZL could not leave until he received an advanced parole document. EZL received his advanced parole document prior to his permanent residency, but Respondent did not return him to Australia at that time.

As part of that same conversation, Petitioner requested that Respondent renew EZL's passport. Respondent stated that "[t]he passport has no bearing for now" and did not renew the passport because, according to him, he lacked the necessary paperwork. Petitioner continued to ask Respondent to make sure that EZL's passport was valid.

At the same time as the parties discussed EZL's immigration status, they began to discuss enrolling EZL in school. This, in turn, led to a discussion about the parties executing a shared parenting plan. The Shared Parenting Plan provided that the parties were "both residential parents and legal custodians" of EZL and that Respondent was "designated the residential parent" of EZL "for school purposes." (Doc. 36-1, Pet.'s Ex. 8 at II(A)-(B)).

A review of the parties' communications regarding the Shared Parenting Plan makes clear that the parties did not trust one another. Petitioner expressed concern that Respondent had "tricked" her into signing the Plan. (*Id.*, Pet.'s Ex. 12 at 2). Respondent insisted that the Shared Parenting Plan would only be used to allow him to enroll EZL in school. (*Id.*, Pet.'s Ex. 7).

Respondent enrolled EZL in school in July 2017. (Doc. 36-3, Resp.'s Ex. E at 1). EZL began kindergarten shortly thereafter, (*id.*), presumably in August 2017. By November of 2017, EZL was reading at a higher level than his peers, so he began joining a first-grade reading group. EZL's kindergarten report card indicates that for the first half of the year he was generally

progressing towards the grade level standard or, in the case of reading and mathematics, meeting the grade level standard.  (Doc. 36-3, Resp.'s Ex. E at 2–3).

### E.  The Alleged Wrongful Retention

Petitioner traveled to the United States in December 2017 for the purpose of taking EZL back to Australia.  Respondent refused to give her EZL's passport, and she was unable to bring EZL home with her.  Before Petitioner returned to Australia, Respondent agreed to return EZL when his U.S. passport was issued.

On January 8, 2018, shortly after Petitioner returned to Australia, EZL received his permanent resident card.  (Doc. 36-2, Pet.'s Ex. 35).  Towards the end of January, Respondent informed Petitioner that he would not return EZL to Australia when EZL's passport was issued. Petitioner contacted the State Department's Office of Children's Issues to enroll in the Children's Passport Issuance Alert Program (CPIAP) and put a hold on EZL's United States passport.  In response, Respondent burned EZL's expired Filipino passport and sent Petitioner photos of the burnt passport.  (Doc. 36-2, Pet.'s Ex. 23).  Petitioner subsequently withdrew EZL from CPIAP, which allowed his application for a passport to be processed.  (Doc. 36-3, Resp.'s Ex. H).

Throughout February and March 2018, the parties' relationship continued to deteriorate. (*See generally* Doc. 36-1, Pet.'s Exs. 15–17; Doc. 36-2, Pet.'s Exs. 18–22, 24–33).  On February 16, 2018, the United States issued EZL's passport.  (Doc. 36-2, Pet.'s Ex. 36).  Respondent repeatedly refused to return EZL to Australia.  (*Id.*, Pet.'s Exs. 26–29, 31–33).  Although Respondent had previously represented that the parties' Shared Parenting Plan would only be used to enroll EZL in school, to justify his refusal to return EZL, he insisted that it gave him custody of EZL and therefore he was under no obligation to return EZL to Petitioner as the parties had agreed. (*Id.*, Pet.'s Ex. 26).  On July 13, 2018, the United States government issued EZL's certificate of

citizenship, which indicated that EZL became a citizen of the United States on January 6, 2018. (Doc. 36-3, Resp.'s Ex. E at 9, PAGEID #: 778). Respondent did not return EZL to Australia.

## F. The Filing of the Petition and Proceedings Regarding the Same

Petitioner filed the Petition on October 23, 2018. (Doc. 1). The Court subsequently referred this matter to the Undersigned "to conduct a trial on Petitioner's Petition for the Return of Child . . . and for all related matters." (Doc. 17). Respondent filed a Motion for Summary Judgment (Doc. 22), which the Court denied in its March 25, 2019 Opinion and Order (Doc. 27). The Undersigned conducted a trial in this matter on April 10, 2019 and granted the parties seven days in which to file post-trial briefs. The time for filing post-trial briefs has passed, and the matter is ripe for resolution.

## II. DISCUSSION

The purpose of the Hague Convention is "to return children 'to the State of their habitual residence,' to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child." *Taglieri*, 907 F.3d at 407 (quoting Hague Convention pmbl.).

> Federal law, namely the International Child Abduction Remedies Act, implements the Hague Convention and hews to the treaty's language. A parent may petition a federal or state court to return abducted children to their country of habitual residence. The federal or state court determines whether to return the child. Courts in the country of habitual residence then determine the merits of any underlying child custody claims.

*Taglieri*, 907 F.3d at 407 (internal citations and quotation marks omitted).

The parent seeking return of a child must prove by a preponderance of evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). A child's removal or retention is "wrongful" when:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. "Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

"The key inquiry in many Hague Convention cases, and the dispositive inquiry here, goes to the country of the child's habitual residence." *Taglieri*, 907 F.3d at 407. "Habitual residence marks the place where a person customarily lives." *Id.* (citation omitted). This is a question of fact. *Id.* at 408 (collecting cases).

When determining a child's habitual residence, the Sixth Circuit applies one of two standards depending on the facts of the case. *Id*. at 407. "The primary approach looks to the place in which the child has become 'acclimatized.'" *Id.* (quoting *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017)). When applying the acclimatization standard, "the question is whether the child has been physically present in the country for an amount of time sufficient for acclimatization and whether the place has a degree of settled purpose from the child's perspective." *Taglieri*, 907 F.3d at 408 (citation and internal quotations omitted). "District courts ask these sorts of questions in determining a child's acclimatization: whether the child participated in academic activities, social engagements, sports programs and excursions, and whether the child formed meaningful connections with the country's people and places." *Id.* (internal citations, alterations, and quotations omitted).

This analysis is guided by five principles:

- First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case.

- Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence.

- Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry.

- Fourth, a person can have only one habitual residence.

- Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007) (internal citations, alterations, and quotations omitted).

"The second approach, a back-up inquiry for children too young or too disabled to become acclimatized, looks to 'shared parental intent.'" *Taglieri*, 907 F.3d at 407 (quoting *Ahmed*, 867 F.3d at 689). This standard requires courts "to identify the location where the parents intended the child to live." *Taglieri*, 907 F.3d at 408.

Which standard applies here? To answer that question, the Undersigned first determines when the alleged wrongful retention of EZL began.

In the case of a wrongful retention, the time begins to run either (1) from the date the child remains with the abducting parent despite the clearly communicated desire of the left-behind parent to have the child returned, or (2) when the acts of the abducting parent are so unequivocal that the left-behind parent knows or should know, that the child will not be returned[.]

*Diagne v. Demartino*, No. 2:18-CV-11793, 2018 WL 4385659, at *11 (E.D. Mich. Sept. 14, 2018) (internal citations omitted); *see also Djeric v. Djeric*, No. 2:18-CV-1780, 2019 WL 1046893, at *3 (S.D. Ohio Mar. 5, 2019) (holding that, when determining the date the alleged wrongful

retention began, "courts look to the last date upon which it is undisputed that the child was in the new country with both parents' consent. Specifically, courts look to the date when the non-abducting parent was truly on notice that the abducting parent was not going to return the child." (citations omitted)). The date of the wrongful retention is important because it "is used to fix the time period available for assessing what country is properly the child's habitual residence." *McKie v. Jude*, No. CIV.A. 10-103-DLB, 2011 WL 53058, at *6 (E.D. Ky. Jan. 7, 2011) (citation omitted); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) ("[O]ur court's precedent instructs courts to look back in time from the period of wrongful retention, not forward.").

In late December 2017 and early January 2018, Petitioner traveled to the United States with the intention of returning EZL to Australia. During that time period, she demanded that Respondent provide her with EZL's passport and communicated her intention to return to Australia with her son. Respondent, nonetheless, refused to give Petitioner EZL's passport, and EZL remained with Respondent in the United States. The Undersigned therefore finds that the alleged wrongful retention began in late December 2017.[2] *See Djeric*, 2019 WL 1046893, at *3; *Diagne*, 2018 WL 4385659, at *11.

At that time, EZL was five years old. The Sixth Circuit applies the shared parental intent standard to "infants," "especially young children," and children "too disabled to become acclimatized." *Taglieri*, 907 F.3d at 407–08; *Ahmed*, 867 F.3d at 690. Although there "is not a bright-line rule" for applying the shared parental intent standard, in practice, courts in the Sixth Circuit generally apply this standard to children who are two years old or younger at the time of the wrongful removal or retention. *See, e.g.*, *Taglieri*, 907 F.3d at 408 ("No one thinks that A.M.T.

---

[2] Petitioner did not identify a specific date on which she demanded EZL's passport and that he return to Australia with her. The Undersigned therefore uses late December 2017 for ease of reference. Regardless of whether the alleged wrongful retention began in late December 2017 or early January 2018, the Undersigned's habitual residence analysis would be the same.

was in a position to acclimate to any one country during her two months in this world. That means this case looks to the parents' shared intent."); *id.*, 907 F.3d at 412 (Boggs, J., concurring) ("[A]rguably a child of even a year or two may be too young to acclimate to a country that it cannot, or can only barely, recognize." (citing *Ahmed*, 867 F.3d at 690)); *Ahmed*, 867 F.3d at 690–91 (applying shared parental intent standard when determining habitual residence of infants less than a year old); *Vasquez v. Acevedo*, 3:18-cv-00137, Doc. 38 at 38–39 (M.D. Tenn. Apr. 16, 2018) (applying shared parental intent standard when determining habitual residence of two-year-and-four-month-old child). For children who are older at the time of the alleged wrongful removal or retention, courts in the Sixth Circuit generally apply the acclimatization standard. *See, e.g.*, *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (applying acclimatization standard when determining habitual residence of three-year-old child); *Robert*, 507 F.3d at 995–96 (holding that acclimatization standard, not shared parental intent standard, should be applied when determining habitual residence of six-year-old twins). With these guideposts in mind, the Undersigned is compelled to conclude that the acclimatization standard governs the habitual residence analysis.

The central question in this case is therefore whether in late December 2017, EZL had been physically present in the United States for an amount of time sufficient for acclimatization and whether the United States had a degree of settled purpose from his perspective. By that time, EZL had been in the United States for approximately ten months. In those ten months, he developed close relationships with his extended family, particularly his cousin Matthew, and various family friends. EZL played on a basketball team, attended church and a bible school, and regularly went to the movies, theme parks, the zoo, and museums with friends and family. Finally, EZL was enrolled in school, which he began attending in August 2017. Based on this evidence, the Undersigned concludes that EZL "formed meaningful connections with the country's people and

places" during the ten months prior to the alleged wrongful retention. *Taglieri*, 907 F.3d at 408 (internal citations, alterations, and quotation marks omitted). From EZL's perspective, the United States was his place of habitual residence in late December 2017 as defined by Sixth Circuit precedent. *See Jenkins*, 569 F.3d at 556–57 (holding that a six-month stay in a new country sufficed to create a new habitual residence, in light of continued schooling and other regular activities in the new country); *Robert*, 507 F.3d at 997 (holding that a ten-month stay in one country with sustained schooling and family excursions sufficed to create a new habitual residence, but that a three-week stay in another country did not).

Petitioner implicitly argues that, despite EZL residing in the United States for ten months before the alleged wrongful retention, Australia remained EZL's place of habitual residence. Between January 2016 and February 2017, Petitioner and EZL resided in Melbourne, Australia. While in Australia, EZL developed close relationships with his Aunt Kristal and his cousin, Gabrianna. EZL regularly attended church and went on excursions to parks, museums, and other local events with friends and family. EZL also attended kindergarten on a full-time basis beginning in June 2016. The Court, therefore, has little trouble finding that, prior to his arrival in the United States in February 2017, Australia was EZL's habitual residence.

Unfortunately for Petitioner, the Undersigned is required to determine EZL's habitual residence at the time of the wrongful retention. And Petitioner has not met her burden to demonstrate by a preponderance of the evidence that Australia was EZL's habitual residence in late December 2017. As the analysis above makes clear, for every piece of evidence that suggests Australia was EZL's habitual residence in February 2017, a similar, if not identical, piece of evidence supports the conclusion that the United States was EZL's habitual residence in late December 2017. In both countries, EZL lived with extended family and developed a particularly

close relationship with one of his cousins. In both countries, EZL actively explored the local community, attended church, and went on excursions to parks and museums. In both countries, EZL attended school for a portion of the relevant time period. In short, if Australia was EZL's habitual residence in February 2017, the Undersigned has difficulty seeing how the United States was not EZL's habitual residence in late December 2017.

Under Sixth Circuit precedent, EZL had acclimatized to the United States by the time of the alleged wrongful retention in late December 2017. Consequently, the Hague Convention cannot afford Petitioner relief here.

In coming to this conclusion, the Undersigned notes this is a cautionary tale about the limits of the Sixth Circuit's acclimatization standard. In February 2018, when Petitioner discussed returning EZL to Australia, Respondent refused, stating, "[y]ou should have realised [sic] [EZL] is here and I have the edge . . ." (Doc. 36-2, Pet.'s Ex. 18 at 4). That is ultimately what this case is about. By refusing to return EZL to Australia consistent with the parties' agreement, Respondent has manufactured a favorable status quo that he will undoubtedly rely on in any future custody proceedings between the parties. But that status quo is contrary to the parties' shared intent, which the acclimatization standard does not permit courts to consider in resolving the habitual residence question in cases like the one before the Court here. Rather than incentivizing behavior consistent with the purposes of the Convention, the application of that standard here appears to reward Respondent for conduct that undermines the Convention's mission.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Petition (Doc. 1) be **DENIED**.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:   April 26, 2019                     /s/ Kimberly A. Jolson                    
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE