IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GOLDI Y. CAPALUNGAN,

    Petitioner,

vs.
                                                    Case No.: 2:18-cv-1276
                                                   JUDGE GEORGE C. SMITH
                                                   Magistrate Judge Jolson

EMMANUEL R. LEE,

    Respondent.

## OPINION AND ORDER

On April 26, 2019, the United States Magistrate Judge issued a *Report and Recommendation* recommending that Petitioner's Petition for the Return of Child to Australia Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction be denied. (*See Report and* Recommendation, Doc. 38). The parties were advised of their right to object to the *Report and Recommendation*. This matter is now before the Court on Petitioner's Objections to the *Report and Recommendation*. (*See* Doc. 39). Both parties have filed multiple responses and replies. (*See* Docs. 40–45). This matter is fully briefed. The Court will consider the matter *de novo*. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

### I. BACKGROUND

The factual background is set forth in detail in the *Report and Recommendation* and the entirety will not be repeated. However, a summary is included for reference.

Petitioner, Goldi Y. Capalungan, and Respondent, Emmanuel R. Lee, are the biological parents of EZL, the subject of the instant Petition. (Doc. 1; Doc. 36-3, Resp.'s Ex. A). The parties

began their relationship in the Philippines approximately ten years ago. EZL was born on August 31, 2012 in the Philippines. (Doc. 36-3, Resp.'s Ex. A). At that time, Respondent was living in the United States. Respondent had limited contact with EZL in the years immediately following EZL's birth. The parties were never married and did not have any custody agreement.

In January 2016, Petitioner and EZL moved to Australia. Petitioner and EZL lived with Petitioner's sister and her daughter, Gabrianna, who was like a sister to EZL. EZL attended school full-time. Respondent had no contact with EZL when he lived in Australia.

In January 2017, Petitioner obtained new employment in Australia and she would have to participate in an extended training program. The parties agreed that EZL could visit Respondent in the United States during Petitioner's training period. The parties expected the training to last about six months—the same length of time as EZL's tourist visa. Petitioner and EZL traveled to the United States in late February 2017. Petitioner stayed with Respondent for approximately two weeks, but then returned to Australia for her training. After Petitioner's departure in March 2017, EZL adjusted well to life in the United States by spending time with family, attending church and school. Shortly after Petitioner returned to Australia, her relationship with Respondent began to deteriorate.

The Magistrate Judge in her *Report and Recommendation* acknowledged that the parties "offered competing accounts of the terms of their agreement for the return of EZL to Australia." (Doc. 38, R&R at 5). Petitioner testified that the parties' original plan was for EZL to stay in the United States while she completed her training in Australia. Petitioner further testified that the agreement changed in that EZL would be returned after Petitioner's training was complete and after EZL was granted permanent residency in the United States, which she believed would be

completed before she was done with her six-month training. (Transcript at 84). Although Respondent conceded that "initially" EZL "was to be returned to Australia" in August 2017, at another point, he insisted that the agreement had always been that EZL would reside in the United States until he received citizenship here. Despite EZL obtaining his United States citizenship, Respondent never returned him to Australia as agreed.[1]

During the next few months, the parties had many conversations, generally via text message, regarding EZL's current Filipino passport and his immigration status in the United States. (Doc. 36-1, Pet.'s Exs. 9–11). Additionally, to enroll EZL in school, the parties executed a Shared Parenting Plan that provided that both parties were "residential parents and legal custodians" of EZL and that Respondent was "designated the residential parent" of EZL "for school purposes." (Doc. 36-1, Pet.'s Ex. 8 at II(A)–(B)).

In December 2017, Petitioner traveled to the United States to take EZL back to Australia. Respondent refused to give her EZL's passport, and she was unable to bring EZL home with her. Before Petitioner returned to Australia, Respondent agreed to return EZL when his U.S. passport was issued. On January 8, 2018, shortly after Petitioner returned to Australia, EZL received his permanent resident card. (Doc. 36-2, Pet.'s Ex. 35). Towards the end of January, Respondent informed Petitioner that he would not return EZL to Australia when EZL's passport was issued. Petitioner contacted the State Department's Office of Children's Issues to enroll in the Children's Passport Issuance Alert Program ("CPIAP") and put a hold on EZL's United States passport. In

---

[1] The Magistrate Judge observed that "Respondent was consistently evasive and less than candid when testifying about the parties' agreement to return EZL to Australia. He did, however, concede that the parties had agreed EZL would be returned to Australia and that he failed to comply with that agreement." (Doc. 38, R&R at 3).

3

response, Respondent burned EZL's expired Filipino passport and sent Petitioner photos of the burnt passport. (Doc. 36-2, Pet.'s Ex. 23). Petitioner subsequently withdrew EZL from CPIAP, which allowed his application for a passport to be processed. (Doc. 36-3, Resp.'s Ex. H).

EZL's United States passport was ultimately issued on February 16, 2018. (Doc. 36-2, Pet.'s Ex. 36). Respondent repeatedly refused to return EZL to Australia. (*Id.*, Pet.'s Exs. 26–29, 31–33). Although Respondent had previously represented that the parties' Shared Parenting Plan would only be used to enroll EZL in school, to justify his refusal to return EZL, he insisted that it gave him custody of EZL and therefore he was under no obligation to return EZL to Petitioner as the parties had agreed. (*Id.*, Pet.'s Ex. 26). On July 13, 2018, the United States government issued EZL's certificate of citizenship, which indicated that EZL became a citizen of the United States on January 6, 2018. (Doc. 36-3, Resp.'s Ex. E at 9, PAGEID #: 778). Respondent did not return EZL to Australia.

Petitioner filed the Petition currently before the Court on October 23, 2018. (Doc. 1). The Court subsequently referred this matter to the Magistrate Judge "to conduct a trial on Petitioner's Petition for the Return of Child . . . and for all related matters." (Doc. 17). Respondent filed a Motion for Summary Judgment (Doc. 22), which the Court denied in its March 25, 2019 Opinion and Order (Doc. 27). The Magistrate Judge held a trial in this matter on April 10, 2019, and issued her *Report and Recommendation* on April 26, 2019. (Doc. 38).

## II. DISCUSSION

Petitioner raises two main objections to the Magistrate Judge's *Report and Recommendation*. (Doc. 39). First, Petitioner argues that the Magistrate Judge incorrectly found that at the time of the wrongful removal of EZL that his habitual residence had changed from

4

Australia to the United States. Second, Petitioner argues that the Magistrate Judge applied the acclimatization standard to determine EZL's habitual residence and should have applied the "shared parenting intent" standard to determine his habitual residence at the time of the wrongful removal. (*Id.*). The Court will address the applicable standard objection first and then the habitual residence determination.

## A. Applicable Standard for Determining Habitual Residence

Petitioner filed this Petition pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, whose purpose is to "return children 'to the State of their habitual residence,' to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child." *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2018). The Magistrate Judge correctly set forth the applicable standard: Petitioner must prove by a preponderance of evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A); (Doc. 38, R&R at 9).

There is no objection regarding the Magistrate Judge's findings that Respondent refused to return EZL to Australia based on the agreement of the parties. Nor was there any objection to the finding that the alleged wrongful retention began in late December 2017. (Doc. 38, R&R at 12). The date of the wrongful retention is important because it "is used to fix the time period available for assessing what country is properly the child's habitual residence." *McKie v. Jude*, No. CIV.A. 10-103-DLB, 2011 WL 53058, at *6 (E.D. Ky. Jan. 7, 2011) (citation omitted); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) ("[O]ur court's precedent instructs courts to look back in time from the period of wrongful retention, not forward."). At this point, the Magistrate Judge then determined based on the fact that EZL was five years old in December 2017,

5

that the Sixth Circuit instructs courts to apply the acclimatization standard. Petitioner objects to this decision and argues that the Magistrate Judge should have applied the shared parenting intent standard to determine EZL's habitual residence at the time of the wrongful removal.

The Sixth Circuit in *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017), offers two approaches to identify a child's habitual residence. The primary approach looks to the place in which the child has become "acclimatized." *Id.* at 687. The second approach, a back-up inquiry for children too young or too disabled to become acclimatized, looks to "shared parental intent." *Id.* at 689; *see also Robert v. Tesson*, 507 F.3d 981, 992 n.4 (6th Cir. 2007).

Petitioner asserts in her objections that the acclimatization standard should not be the only standard applied, rather the Court should also apply the shared parental intent standard. In *Ahmed*, the Sixth Circuit emphasized the importance of applying the shared parental intent of the parties in cases involving young children who lack the cognizance to acclimate to any residence. The Court stated that "[t]his is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case." *Ahmed*, 867 F.3d at 690. The Court is sympathetic to Petitioner in that the record shows that the intent of the parties was to return EZL to Australia and understands her argument seeking application of the shared parental intent standard. However, the Court agrees with the analysis set forth in detail in the *Report and Recommendation* that courts in the Sixth Circuit generally apply the shared parental intent standard to children who are two years old or younger at the time of the wrongful retention. (Doc. 38, R&R at 12-13). The Magistrate Judge noted that "this is a cautionary tale about the limits of the Sixth Circuit's acclimatization standard" and the Court wholeheartedly agrees. (*Id.*).

The record is replete with instances in which Respondent was evasive and misleading.[2] By February 2018, Respondent no longer hiding the fact that he had no intention of returning EZL to Australia stated, "[y]ou should have realized [sic] [EZL] is here and I have the edge. . ." (Doc. 36-2, Pet.'s Ex. 18 at 4). The Magistrate Judge aptly acknowledged the consequences of Respondent's behavior: "[b]y refusing to return EZL to Australia consistent with the parties' agreement, Respondent has manufactured a favorable status quo that he will undoubtedly rely on in any future custody proceedings between the parties. But that status quo is contrary to the parties' shared intent, which the acclimatization standard does not permit courts to consider in resolving the habitual residence question in cases like the one before the Court here." (Doc. 38, R&R at 15).

Petitioner urges this Court to reverse the Magistrate Judge's *Report and Recommendation* based on language from Sixth Circuit cases such as *Ahmed* (instructing courts to look at the "unique facts and circumstances of each case") and *Taglieri*, 907 F.3d at 407 (wherein the Sixth Circuit stresses the importance of the district court in serving as the fact finder). (Doc. 39, Pet.'s Objs. at 10). Unfortunately, even though the facts may favor Petitioner in this case, the law does not. The Sixth Circuit law instructs this Court to apply the acclimatization standard and therefore the Court must agree with the Magistrate Judge's conclusion that the acclimatization standard must be applied in this case.

---

[2] In text messages discussing the shared parenting plan, Exhibit 7, Petitioner had doubts about it but Respondent "guaranteed me that it is only for school purposes." (Draft Tr. at 42, 89; Ex. 7). Also, in discussing the purpose of obtaining EZL a U.S. passport, Respondent assured Petitioner that he wanted it so that EZL could travel freely. (*Id.* at 89-90). In text messages in Exhibits 9 and 23, the parties discuss the status of EZL's Filipino passport and the fact that it needed renewed so he could return to Australia, but then Respondent burned EZL's Filipino passport. Respondent testified that he agreed to return EZL to Australia and didn't. (*Id.* at 24). Respondent told Petitioner that EZl could not leave the United States during the immigration process. (*Id.* at 33).

## B. Habitual Residence

Petitioner objects to the Magistrate Judge's recommendation that EZL's habitual residence had changed from Australia to the United States. Petitioner's primary argument is that Respondent has failed to comply with the parties' agreement to return EZL to Australia. Petitioner references several cases outside of this Circuit in support of his argument that wrongful retention cannot create a new habitual residence. (Doc. 39, Pet.'s Objs. at 5, citing *Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006); *Garcia v. Pinelo*, 125 F. Supp. 3d 794 (N.D. Ill. 2015); and *Palencia v. Perez*, 921 F.3d 1333 (11th Cir. 2019)).

The evidence supports Petitioner's contention that EZL's stay was only intended to be temporary in nature and the parties agreed he would be returned to Australia. However, Petitioner continues to confuse the standard that must be applied to the facts of this case. The appropriate question as set forth in the *Report and Recommendation* is "whether in late December 2017, EZL had been physically present in the United States for an amount of time sufficient for acclimatization and whether the United States had a degree of settled purpose from his perspective." (Doc. 38, R&R at 13).

In the ten months that EZL had been in the United States, he attended school, church, played on a basketball team, and participated in activities with family and friends. Ten months is a considerable amount of time to form bonds with family and friends considering he was only five years old. Relying on the testimony and Sixth Circuit precedent, the Magistrate Judge correctly determined that the United States was EZL's habitual residence in late-December 2017. (*Id.* at 14, citing *Jenkins*, 569 F.3d at 556-57 (holding that a six-month stay in a new country sufficed to create a new habitual residence, in light of continued schooling and other regular activities in the

8

new country); *Robert*, 507 F.3d at 997 (holding that a ten-month stay in one country with sustained schooling and family excursions sufficed to create a new habitual residence, but that a three-week stay in another country did not)). Accordingly, the Court agrees with the findings set forth in the Magistrate Judge's *Report and Recommendation* that Petitioner has not met her burden to demonstrate by a preponderance of the evidence that Australia was EZL's habitual residence in late December 2017.

### III. CONCLUSION

Therefore, for the reasons stated in detail in the *Report and Recommendation*, this Court finds that Plaintiff's Objections are without merit and are hereby **OVERRULED**.

The *Report and Recommendation*, Document 38, is hereby **ADOPTED** and **AFFIRMED**. Plaintiff's Petition is hereby **DENIED**.

The Clerk shall remove Documents 38 and 39 from the Court's pending motions list. The Clerk shall enter final judgment in favor of Respondent.

**IT IS SO ORDERED.**

_____
MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT
ON BEHALF OF
GEORGE C. SMITH, JUDGE